**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| ALLEN J. FARMER, | : | |
| | : | Civil Action No. 10-5824 (SDW) |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| BRIAN RIORDAN, et al., | : | |
| | : | March 26, 2015 |
| Defendants. | : | |
| | : | |

**WIGENTON**, District Judge:

Presently before the Court are two motions for summary judgment, the first brought by Defendants Director Brian Riordan, Correction Officer Edward Brooks, Correction Officer Kevin McClave, Sergeant Hector Ospina, Sergeant Kenneth Houston, Sergeant Kenny Burkert, Correction Officer Lociano Porto, Correction Officer Na'Zeek Hurling, Sergeant William Atile, Officer Alonzo, and Sheriff's Officer Michael Maiorelli (collectively "the law enforcement Defendants") (ECF No. 117); and the second brought by Defendants Prisoner Health Services, Inc., Sharon Regan, Patricia West, and Maria Romero (pled as Maria Ramirez) (collectively "the medical Defendants") (ECF No. 118). Plaintiff, Allen J. Farmer, filed briefs in opposition to both motions. (ECF No. 121, 122) The law enforcement Defendants filed a reply brief (ECF No. 120) to which Plaintiff responded (ECF No. 124). For the following reasons, the Court grants both motions for summary judgment.

1

## I.  BACKGROUND

The following facts are taken from the record evidence submitted by the parties.   Factual disputes are noted herein.   Plaintiff was, at the time of the events which give rise to his complaint, a pre-trial detainee at the Union County Jail.   Plaintiff's complaint arises out of four incidents involving altercations with law enforcement or corrections personnel and his claim that he received inadequate medical care following the third incident.   The first such incident occurred on July 2, 2009.   (Officer Maiorelli's report attached to Exhibit N to ECF No. 117).   On that date, Plaintiff was present at the Union County Superior Court for a bail hearing.   (Id.).   Because Plaintiff had gone outside while awaiting his turn, Judge Moynihan of the Superior Court sent Sheriff's Officers Maiorelli and McPherson to retrieve him.   (Id.).   After re-entering the building at the officers' request, Plaintiff retrieved his belongings and then ran back outside of the courthouse.   (Id.).   Officer Maiorelli, along with another Sheriff's officer, then chased Plaintiff and ordered him to stop, a command Plaintiff refused to follow. (Id.).   A fourth Officer, Officer Hidalgo, then joined the chase after observing defendant and hearing of his flight via radio, and was ultimately able to bring Plaintiff to the ground.   (Officer Hidalgo's Report attached to Exhibit N to ECF No. 117). Because Plaintiff continued to attempt to escape Officer Hidalgo and, in so doing, began to flail his arms and legs, the remaining officers aided Hidalgo in restraining Plaintiff.   (Id.).   Once Plaintiff was properly restrained, a substance believed to be marijuana was recovered from his person, and Hidalgo was sent to the hospital to receive medical treatment.   (Id.).

As a result of Plaintiff's flight and resisting of the officers, he was thereafter charged with aggravated assault, resisting arrest, and obstruction.   (Exhibit P to ECF No. 117).   Following these events, Plaintiff informed the sheriff's office that he intended to file a complaint against officer Hidalgo, claiming that while they were restraining him, the officers kicked, struck, and beat

Plaintiff and levied several racial slurs against him.  (Exhibit N to ECF No. 117).  The Sheriff's Office Internal Affairs Unit, however, concluded, based on a viewing of a DVD recording[1] of the officers' detention of Plaintiff and interviews of the officers, that Plaintiff's claims were unsubstantiated and his claims of racial slurs and beatings were false.  (Exhibit N to ECF No. 117).  Plaintiff disputes these facts, contending that the sheriff's officers acted without warrant or justification, and that he ran due to "severe Post Traumatic Stress Disorder."  (Plaintiff's Certification attached to ECF No. 119 at ¶ 20-21).  Plaintiff also claims that Sheriff's officer Hidalgo and other unknown officers "tackled, kicked, punched, and grabbed [him] by the hair." (Id. at ¶ 22).

The second incident about which Plaintiff complains occurred on July 5, 2010.  That evening, after the prisoners had been locked into their cells, Plaintiff began to yell at Correction Officer Wilson.  (Exhibit K to ECF No. 117).  Amidst the comments Plaintiff made towards the officer was the following statement: "Wilson there's [going to] be people waiting around your car for when you leave." (Id.)  After Plaintiff's yelling continued for ten minutes, Sergeant Burkert arrived, and was informed of the comments and threats made by Plaintiff to Officer Wilson.  (Id., Exhibit L to ECF No. 117).  The Sergeant then approached Plaintiff, who admitted to the threats and claimed he had made the statements because Wilson had changed the television channel. (Exhibit L to ECF No. 117).  Plaintiff, during his deposition, disputes these facts only to the extent that he claims that, while he did become verbally abusive towards Wilson, he claims that he did not issue the threat.  (Exhibit C to ECF No. 117, dep. at 32-33).

Based on the threats, the Sergeant asked two officers, Pozsonyi and Lang, to assist him in

---

[1] A copy of this DVD is attached to ECF No. 117 as Exhibit O, and supports the contentions of the officers.

escorting Plaintiff to detention.   (Exhibit L to ECF No. 117).   The officers then escorted Plaintiff

onto the elevator, at which time he attempted to escape restraints and pushed his body weight

towards the sheriff, who engaged Plaintiff in a "mandibular angle pressure point to gain more

control" over Plaintiff.   (Id.).   Plaintiff then became verbally abusive until the officers brought

him to detention.   (Id.).   While being placed into detention, Plaintiff on three occasions refused

to comply with the Sergeants orders, and had to be threatened with the use of pepper spray to

coerce him into proper behavior.   (Id.)   The incidents, both on the elevator and in detention, were

video recorded, and a nurse checked Plaintiff's neck and was on standby during the incidents in

the detention area.   (Id.).   Plaintiff disputes the reported version of the events in the elevator,

claiming that he was held in the elevator with his face "forced into the . . . wall" and that it was in

response to this that he "turned his face the opposite way" after which he was "grabbed by the

throat . . . [and] choked for some time."   (Plaintiff's Certification attached to ECF No. 119 at ¶

17-19).

Based on his behavior during this incident, Plaintiff was charged and adjudicated guilty of

the following disciplinary acts: conduct which disrupts or interferes with security or the orderly

running of the jail and threatening another with bodily harm or with any offense against his person

or property.   (Exhibit M to ECF No. 117).   Plaintiff received 10 days as a sanction for these

offenses.   (Id.).

The third incident, out of which Plaintiff's medical allegations arise, occurred at

approximately 5:40 p.m.[2] on August 2, 2010.   At that time, Plaintiff fell down a flight of stairs in

his cell block and injured his back.   (Exhibit C to ECF No. 117, dep. at 8-9, Exhibit B to ECF No.

---

[2] Plaintiff claims the fall may have occurred earlier (between four and five p.m.), the operations
report filed by Officer Contreras, however, lists 5:40 as the actual time of the incident.

17).   Corrections Officer Contreras, who witnessed the fall, called in a request for a medical response team and his sergeant to report to the area.   (Exhibit B to ECF No. 117).   Medical staff responded to the incident, and Plaintiff was placed in a wheelchair and escorted to the jail's medical ward.   (Id.).   Although Plaintiff reported being unable to stand at the time, Nurse Mackie observed that Plaintiff was able to move his legs.   (Exhibit A to ECF no. 118 at 35-40).

After being taken to the medical ward, Plaintiff's condition was evaluated by nurse practitioner Patricia Stephens.   (Exhibit A to ECF No. 118 at 36, 40).   During the evaluation, the nurse practitioner noted that Plaintiff appeared to sit more comfortably than his claimed pain would allow, and that Plaintiff became agitated at the questions asked by the nurse practitioner.   (Id. at 40).   Following the evaluation, the nurse practitioner conferred with Dr. Ghanbari, who instructed her that Plaintiff was to remain in the medical ward for observation overnight and ordered that Plaintiff be provided with Motrin 600 mg and possibly be taken for X-rays the following morning. (Id. at 40, 7-10, 102).   Plaintiff was therefore placed on a mattress in the medical ward for the night.   (Id. at 40).   Plaintiff was instructed to remain on his back and in good posture, and not to attempt to stand or walk, (Id. at 36), but again cursed at the medical staff.   (Id. at 36-37). Throughout the evening of August 2, several medical staff members checked up on Plaintiff, noting that he changed positions several times and appeared to be able to rest comfortably.   (Id. at 36-37, 40, 76).   After being instructed by medical staff that he would not be able to use the phone by way of wheelchair, Plaintiff became confrontational with medical staff, and refused to cooperate with further neurological evaluations.   (Id. at 37-38).

The following morning, August 3, 2010, Plaintiff, apparently in an attempt to obtain help reaching his breakfast, began to beat a metal, jail-issued cup against the ground.   (Exhibit C to ECF No. 117, Dep. at 12-13).   In response to the noise of the cup striking the cell, Officer

McClave entered Plaintiff's cell in the medical ward and ordered him to turn over the metal cup. (Exhibits D-F to ECF No. 117).   Plaintiff refused, and then threatened to throw a full urinal device at the officer.   (Id.).   Sergeant Ospina, who was nearby, then arrived, and, after hearing the threat, ordered Plaintiff to hand the urinal to a second officer, Officer Brooks.   (Id.).   After plaintiff surrendered the urinal, he was again ordered to turn over the cup, but refused to comply.   (Id.). Sergeant Ospina then ordered the other two officers to assist him, at which point Plaintiff laid on his stomach and placed the cup underneath him.   (Id.).   Officer Brooks then grabbed Plaintiff's left arm and Officer McClave his right, at which point the officers retrieved the cup.   (Id.). Plaintiff disputes the officers' version of the incident, claiming that the officers placed their knees on his back and neck in order to retrieve the cup, and that Sergeant Ospina ordered the officers to release Plaintiff, which the officers allegedly ignored.   Exhibit C to ECF No. 117, Dep. at 14-20). Neither Sergeant Ospina nor the officers make mention of any such order in their reports. (Exhibits D-F to ECF No. 117).

Following the retrieval of the cup, the officers called for Nurse Regan who attempted to examine Plaintiff, who refused to cooperate, at which point the Nurse and officers left the cell. (Exhibits D-F to ECF No. 117, Exhibit A to ECF No. 118 at 72).   Based on his actions in this incident, Plaintiff was later charged and found guilty of the following disciplinary acts: conduct which disrupts or interferes with security or the orderly running of the jail, threatening with bodily harm or with any offense against his person or property Officer McClave, and refusing to obey an order of a uniformed or civilian staff member.   (Exhibit H to ECF No. 117).   Plaintiff received thirty days for these violations.   (Id.)

On that same morning, August 3, 2010, Plaintiff was examined by Dr. Ghanbari, who found Plaintiff on his back on the floor rather than the in-cell mattress.   (Exhibit A to ECF No. 118 at

42).   Plaintiff claimed he was unable to move back to the mattress.   (Id.)   During the examination, the doctor noted that Plaintiff was "alert, oriented, hostile at times" and had no obvious abrasions or definite neurological deficits, despite his claims of immobility.   (Id.)   The doctor ultimately decided to send Plaintiff to the ER for an X-Ray based on the recent fall and Plaintiff's claim of prior back problems.[3]   (Id.)   Plaintiff was then sent to the hospital, where he was diagnosed with a lower back strain and chronic back pain.   (Id. at 64).   The ER doctor recommended that Plaintiff be treated with non-steroidal anti-inflammatories such as the Motrin he had previously been given for pain.   (Id. at 64).

On August 11, 2010, Plaintiff was also evaluated by an orthopedist, Dr. Schwarz.   (Id. at 38).   Dr. Schwartz noted that although Plaintiff claimed that he suffered from radiating pains from his back down through his legs, Plaintiff apparently felt no such pain while coughing or sneezing, and showed no signs of a muscle spasm, tenderness, or reduced range of motion in his lumbar spine while standing with knees extended.   (Id.).   Based on Plaintiff's good range of motion and ability to bend over and walk both tip-toe and heel to toe, Dr. Schwarz concluded that Plaintiff's complaints were made out of a desire to obtain an MRI, which the doctor noted Plaintiff "obviously [did] not need."   (Id. at 38-39).

On August 14, 2010, prison nurse McCurrie was called to Plaintiff's cell following a claim by Plaintiff that he had fallen while cleaning water out of his cell.   (Exhibit B to ECF No. 118 at ¶ 22).   Plaintiff, however, refused to comply with her attempts to evaluate him as he would not take medication or be cuffed in order to facilitate an evaluation.   (Id., Exhibit A to ECF No. 118 at 73).   As the nurse was not able to perform an evaluation and plaintiff exhibited no signs of

---

[3] Although Plaintiff claims a long history of back problems, he reported no mobility restrictions nor the need for any mobility aids at the time of his incarceration.   (Exhibit A to ECF No. 118 at 5).

immediate distress, he was not evaluated until later that day when he saw nurse practitioner Romero.  (Exhibit B to ECF No. 118 at ¶ 22, Exhibit A to ECF No. 118 at 73, 46).  During her evaluation, Romero noted that Plaintiff refused to stand up as part of the evaluation and insisted on receiving an MRI for his back.  (Exhibit A to ECF No. 118 at 46).  Romero noted no apparent distress or spasm, and noticed Plaintiff wiggling his toes.  (Id.).  Based on Plaintiff's lack of immediate distress and because he became verbally aggressive and refused to follow Romero's directions to take medication, Plaintiff was returned to his cell, although Motrin and another X-Ray was ordered.  (Id.).  Plaintiff's X-Ray, taken that same day, showed a "[n]ormal lumbar spine."  (Id. at 27).  Plaintiff complained of back pain again on August 19, 2010, again requesting an MRI, but medical staff denied the request for an MRI given the recent evaluations and the negative X-ray.  (Id. at 58).

Plaintiff complained of further back pain on September 22, 2010, but refused examination. (Id. at 39).  Four days later, he again requested that he be given an MRI, based on the injuries he sustained both from the stair fall and in falling in the water in his cell on August 16.  (I. at 61-62). Given the negative X-Rays and the diagnoses of the doctors and nurse practitioners who had evaluated Plaintiff, prison medical staff refused the request.  (Exhibit B to ECF No. 118 at ¶ 31).

On October 6, 2010, Plaintiff again filled out a form requesting further evaluation for back pain, trouble sleeping, and difficulty walking.  (Exhibit C to ECF No. 118 at ¶ 31).  Dr. Schwartz therefore reevaluated Plaintiff on October 13, 2010.  (Exhibit A to ECF No. 118 at 59).  During this evaluation, Plaintiff told the doctor that he had suffered back injuries in a 2008 car accident and that his falls and alleged beatings by prison officers during the cup-incident had exacerbated those injuries.  (Id. at 39).  Following his examination, the doctor noted that Plaintiff was able to walk without a limp, bend over to ninety degrees without pain, and exhibited no signs of spasm or

tenderness in the lumbar spine.  (Id. at 39).  Based on these observations and sensation testing, the doctor diagnosed Plaintiff with symptom magnification.  (Id.)  In November 2010, Plaintiff filed a grievance alleging that he had been inadequately treated, which medical officials denied based on the extensive record of his treatment for back issues.[4]  (Exhibit B to ECF No. 118, at ¶ 41).

The final incident about which Plaintiff complains occurred on April 9, 2011, after Plaintiff's cell flooded due to a plumbing problem with his toilet.  (Exhibit I to ECF No. 117). Officer Porto provided Plaintiff with a mop to clean up the flooding, which Plaintiff did.  (Id.). After the mopping was concluded, the Officer retrieved the mop and ordered Plaintiff to return to his cell so that he could be locked back inside multiple times.  (Id.).  Plaintiff instead snatched the mop out of the officer's hands, at which point the officer ordered him to place his hands behind his back and handcuffed Plaintiff.  (Id.).  The officer then turned Plaintiff over to his sergeant without further problems.  (Id.).

Plaintiff, who disputes this version of the April 9, 2011, events, claims that the officer never retrieved the mop, but instead grabbed him and pushed him into a table while cuffing him. (Exhibit C to ECF No. 117, Dep. at 40-42).  Plaintiff admitted in his deposition, however, that he did not give the mop to the officer, claiming that it was not the officer's "job to take mops."  (Id.). Plaintiff also claims that he then asked the head of internal affairs to investigate the matter.  (Id.). One of the investigators employed by the Jail's internal affairs unit, however, certified that neither Officer Porto nor any of the other correction officer Defendants have been investigated for

---

[4]  In addition to treatment for his claims of back pain, Plaintiff's records indicate that he was also treated for psychological issues during his incarceration, including an incident wherein he imbibed spruce scented cleaner, and incidents in October and November of 2010 wherein he claimed that the guards were threatening him and that he would kill any guard who attacked him. (*See* Exhibit A to ECF No. 118 at 53-56, 68, 75, 76).

excessive force while employed at the jail.   (Certification of Julio Davila attached to ECF No. 117).

Based on his behavior during this incident, Plaintiff was charged and administratively found guilty of the following disciplinary violations for which he received a five day sanction: refusing to obey an order of a uniformed or civilian staff member and conduct which disrupts or interferes with security or the orderly running of the jail.   (Exhibit J to ECF No. 117).   In addition, because of Plaintiff's apparently disruptive behavior, Warden Riordan requested that Plaintiff be transferred on September 15, 2011.   (Exhibit Q to ECF No. 117).   Plaintiff was thereafter transferred to New Jersey State Prison on or about September 26, 2011.

Plaintiff filed his initial complaint on or about November 9, 2010, alleging violations of 42 U.S.C. § 1983 by Defendants Riordan, Houston, Reagan, Ospina, Books, McClave, Prison Health Services, and several John Doe defendants arising out of the events described above claiming excessive force, failure to protect and deliberate indifference to Plaintiff's serious medical needs. (ECF No. 1).   The Court permitted Plaintiff's complaint to proceed against defendants Regan, Ospina (mispled as Ospence), Brooks, and McClave, but at that time dismissed the other defendants without prejudice.   (ECF No. 2).   On August 8, 2011, Petitioner submitted an amended complaint (deemed filed by order dated February 8, 2013), against Defendants Riordan, Houston, McClave, Brooks, Regan, Ospence, Romero (mispled as Ramirez), Burkett, Schwartz, Porto, Atile, Hurling, Alonzo, Maiorelli, and Prisoner Health Services.   Defendants filed a motion to dismiss on April 12, 2012, which the Court denied on January 8, 2013.   (ECF No. 30, 51-52). Defendants have since answered the complaint and have filed amended answers.   (ECF No. 32, 54, 64, 83).

The medical Defendants filed a motion for summary judgment on April 26, 2013, which

was administratively terminated on March 11, 2014, as discovery continued.   (ECF No. 68, 91).

The medical Defendants filed a second motion for summary judgment on June 2, 2014.   (ECF No.

106).   The law enforcement Defendants thereafter filed their own motion for summary judgment

on June 13, 2014.   (ECF No. 108).   Those motions for summary judgment were terminated by

order of the Magistrate Judge on September 3, 2014, as discovery remained outstanding.   (ECF

116).   Following the completion of the outstanding discovery, the law enforcement Defendants

refiled a motion for summary judgment on September 25, 2014.   (ECF No. 117).   The medical

Defendants followed suit, filing their own motion for summary judgment on September 26, 2014.

(ECF No. 118).   Plaintiff filed briefs in response to both motions on October 16 and 20, 2014.

(ECF No. 119, 121, 122).   The law enforcement Defendants filed a reply brief on October 21,

2014.   (ECF No. 120).   Plaintiff filed a response to the reply brief on November 3, 2014.   (ECF

No. 124).


## II.   DISCUSSION

### A.   Legal Standard

Pursuant to Rule 56, a motion for summary judgment will be granted where the record

"shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."   Fed. R. Civ. P. 56(a).   At summary judgment, the moving party

bears the initial burden of "identifying those portions of the pleadings depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact."   *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).   A factual dispute is material "if it bears on an essential element of the plaintiff's

claim," and is genuine if "a reasonable jury could find in favor of the non-moving party."   *Blunt*

*v. Lower Merion School Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In making its determination, the Court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Id.* Mere allegations, however, are insufficient to defeat a motion for summary judgment, *Id.*, as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus, a dispute is not genuine where the plaintiff has raised only "some metaphysical doubt as to the material facts." *Id.* at 586.

Once the moving party has met its initial burden, the burden shifts to the non-moving party who must provide evidence such that a reasonable jury could find in the non-moving party's favor. *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014). In meeting its burden, the non-moving party must set forth specific facts showing a genuine issue for trial and may not simply rest upon allegations, speculations, unsupported assertions, or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001); *Serodio*, 27 F. Supp. 3d at 550. The non-moving party must therefore "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23.

**B.   Analysis**

42 U.S.C. § 1983 provides "private citizens with a means to redress violations of federal

law committed by state individuals."   *Woodyard v. Cnty. Of Essex*, 514 F. App'x 177, 180 (3d Cir. 2013).   To assert a claim under the statute, a plaintiff must show that he was a deprived of a federal constitutional or statutory right by a state actor.   *Id.*   When evaluating the merits of a § 1983 claim, the Court must identify the contours of the underling right Plaintiff claims was violated and determine whether Plaintiff has properly alleged the violation of such a right at all.   *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000).   In his amended complaint, Plaintiff raises, in general, three types of § 1983 claims: that corrections and sheriff's officers during the four incidents used excessive force against him, that Sergeants Ospina and Atile failed to protect him from the excessive force of other officers during the August 3, 2010, incident, and that the jail's medical personnel (and Sergeant Houston) were deliberately indifferent to his serious medical needs. Plaintiff additionally pleads a claim against Defendant Brian Riordan, warden of the Union County Jail, which appears to have the facets of both a failure to protect claim as well as deliberate indifference to Plaintiff's medical needs, but ultimately relies upon a theory of vicarious liability. As the various Defendants have moved for summary judgment as to all of Plaintiff's claims, the Court will address each in turn.

**1.  Excessive Force**

Plaintiff first claims that, during his four confrontations with corrections and sheriff's officers, the officers levied excessive force against him.   Plaintiff brings excessive force claims against Sheriff's officers Maiorelli and Hidalgo for the events of July 2, 2009; against Sergeant Burkert for the July 5, 2010 incident; against corrections officers Brooks and McClave for the August 3, 2010 incident; and against officers Porto and Hurling for the April 9, 2011 incident. Because the circumstances of the incident involving the sheriff's officers differ from those of the

three incidents which occurred inside of the county jail, the Court must analyze the sheriff's officers actions separately from those of the corrections officers.   The Court turns first to the three incidents which occurred in the jail.

As Plaintiff was a pre-trial detainee at the time of the three incidents which occurred in the jail, Plaintiff's claims arising out of those incidents must be evaluated under a Fourteenth Amendment Due Process clause analysis.[5]   *See Jackson v. Phelps*, 575 F. App'x 79, 82-84 (3d Cir. 2014).   The Due Process standard protects a pre-trial detainee from "'the use of excessive force that amounts to punishment."   *Id.* at 83 (quoting *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989)).   "Whether force constitutes 'punishment' depends on whether it is 'rationally related to a legitimate nonpunitive governmental purpose' and whether it 'appears excessive in relation to that purpose.'"   *Id.* (quoting *Bell*, 441 U.S. at 561).   "'Absent proof of intent to punish . . . this determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."   *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 584 (1984)). The use of force and restraints that are "reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they

---

[5] Where the application of force is in response to a prison disturbance, the harsher Eighth Amendment standard applies to a pre-trial detainee's excessive force claims.   *See Jackson*, 575 F. App'x at 82-84; *Fuentes v. Wagner*, 206 F.3d 335, 347-48 (3d Cir. 2000).   Although the law enforcement Defendants rely in their brief on *Fuentes* for the proposition that the force involved in the case at bar was less severe than that used in *Fuentes* and therefore is not excessive, Defendants assert that the proper test for determining whether the force here was excessive is that which was annunciated in *Bell v. Wolfish*, 441 U.S. 520, 535-59 (1979), which is the Due Process standard discussed above.   As the Eighth Amendment standard is more stringent and requires proof that Plaintiff was not only punished, but suffered unnecessary and wanton pain and suffering, the failure of Plaintiff's claims under a Due Process analysis would necessitate that his claims would also fail under the Eighth Amendment test.   *See Fuentes*, 206 F.3d at 344-45.

are discomforting." *Bell*, 441 U.S. at 540.  In so determining, the courts "'ordinarily defer to [the] expert judgment' of prison officials, unless there is 'substantial evidence in the record to indicate that the officials have exaggerated their response' to the governmental interest in maintaining security and order.'"  *Jackson*, 575 F. App'x at 82-84 (quoting *Bell*, 441 U.S. at 540 n. 23).

In all three of the incidents which occurred in the jail, Plaintiff has failed to provide proof that the guards involved had an intent to punish him.   As such, the Court must turn to the question of whether the force used against him is rationally related to a legitimate nonpunitive governmental purpose and whether the force was excessive.  *Bell*, 441 U.S. at 561; *Block*, 468 U.S. at 584. As to the events of July 5, 2010, the parties agree that the incident which occurred on that date occurred after Plaintiff had been removed from his cell so that he could be moved to detention for the abusive comments or threats he made to a corrections officer.

Following the removal of Plaintiff from his cell, the officers moved Plaintiff into the elevator, at which point Plaintiff claims that he was choked, which is the force Plaintiff claims was excessive.   Plaintiff claims that an officer (who is not a defendant) held him too close to the wall of the elevator, and in response he turned away, at which point he was grabbed around the throat from behind.   The officers instead report that Plaintiff was placed into a hold by Sergeant Burkert because Plaintiff attempted to use his body weight to struggle against the officers' hold on him. The record also indicates that following the incident on the elevator, Plaintiff remained obstinate and uncooperative throughout the detention process.   Even when viewed in the light most favorable to Plaintiff, the record therefore indicates that Plaintiff initiated the situation with his comments, was not compliant with the officers, and that after Plaintiff turned away from the officer restraining him in the elevator, Sergeant Burkert responded with the use of the mandibular hold in

order to maintain control and security over Plaintiff while moving him from his cell to detention. Plaintiff has provided no evidence that the officers exceeded the amount of force necessary to control him during the elevator ride, nor that Sergeant Burkert engaged the hold for any reason other than to maintain control and security while escorting defendant to lock up based upon the threats/abuse he had hurled at the officer in his cell block.

Even if Plaintiffs allegations and suppositions are taken to be true,  summary judgment would still be appropriate because Plaintiff admits that he turned away from the officer restraining him on the elevator, that the hold by Sergeant Burkert followed as a result, and Plaintiff does not provide sufficient evidence that a reasonable factfinder could find that the Sergeant maintained the hold for any longer than necessary to maintain security and control over Plaintiff while he was being transported to detention following his abusive behavior towards another officer.  As the officers' actions were reasonably related to the maintenance of jail security, and Plaintiff has provided no basis from which a reasonable factfinder could conclude that there is "substantial evidence" in the record for the assertion that the prison exaggerated its response, Plaintiff's claim that the Sergeant and his officers used excessive force during the July 5 incident therefore fails to survive summary judgment, and judgment must be entered in favor of Sergeant Burkert.  *Jackson*, 575 F. App'x at 82-84; *Bell*, 441 U.S. at 540 n. 23.

Turning to the August 3, 2010 incident, the force used by the officers was again warranted by the situation instigated by Plaintiff.  On that morning, Plaintiff, by his own admission, began to loudly bang his prison issued cup in an attempt to garner attention.  The officers responded to his attention seeking behavior by ordering him to surrender the cup, an order to which he responded by threatening to throw a full urinal at the officers.  Sergeant Ospina's report directly refutes Plaintiff's assertion that the officers responded by kneeling upon his back, even after being ordered

to stop by the Sergeant.   Ospina instead reports that he, too, ordered Plaintiff to surrender the cup, and it was only after this order was refused that Officers McClave and Brooks entered the cell, each grabbing one of Plaintiff's arms, and retrieving the cup.   The Sergeant did not observe the officers kneeling upon Plaintiff's back or neck, and reported no order for the officers to release Plaintiff.   Even if one accepts that one of the officer's knelt on Plaintiff's back in order to restrain him while retrieving the cup, that action would have been in response to both Plaintiff's refusal to hand over the cup and his choice to hide the cup under himself to prevent the officers from retrieving it.

The record evidence clearly supports the assertion that the officers responded to Plaintiff's disruptive behavior and only after he refused to follow their orders and surrender the cup did they briefly restrain him to retrieve the cup.   By Plaintiff's own deposition testimony, he refused to hand over the cup, and the officers responded.   Defendants then had a clear non-punitive objective for restraining Plaintiff, and there is no evidence in the record to suggest that their response to Plaintiff's behavior was exaggerated or excessive.   *Jackson*, 575 F. App'x at 82-84; *Bell*, 441 U.S. at 540.   Plaintiff's assertions, without support in the record, are insufficient to overcome summary judgment, and Defendants McClave and Brooks are entitled to judgment as a matter of law on this excessive force claim as well.   *Jackson*, 575 F. App'x at 82-84; *Bell*, 441 U.S. at 540.

The record reveals that the last of the jail house incidents similarly occurred in response to Plaintiff's own behavior.   After flooding his cell, Plaintiff was given a mop to clean up the flooding.   After the cleaning was finished, Plaintiff refused to return the mop to the officer, claiming that it was the trustee, and not the officer, who should have recovered the mop.   Plaintiff refused to comply with the order of the officers, and as a result they retrieved the mop from his possession and handcuffed Plaintiff.   As noted, Plaintiff asserts that the officers pushed him

against a table in the process of handcuffing him and placing him back into his cell.   Even assuming, *arguendo*, that the officers did make use of the table in restraining him, he provides no evidence that these actions were taken for any reason other than for the recovery of the mop and the return of Plaintiff to his cell in furtherance of jail security.   The officers' actions, thus, appear to be reasonably related to the maintenance of jail security, and there is insufficient evidence in the record to conclude that the officers exceeded the necessary amount of force to restrain Plaintiff. *Jackson*, 575 F. App'x at 82-84; *Bell*, 441 U.S. at 540.   Defendants Porto and Hurling are therefore entitled to summary judgment on this claim.

Plaintiff's excessive force claims against the prison defendants all arise out of incidents in which Plaintiff himself created a security issue to which officers responded with apparently reasonable force.   The record is insufficient to allow a reasonable fact finder to conclude that the officers either engaged in force for a punitive purpose or that the force used to restrain Plaintiff exceeded that reasonably necessary to restore security in those situations.   As such, Plaintiff's excessive force claims related to these three incidents must fail as a matter of law.   *Jackson*, 575 F. App'x at 82-84; *Bell*, 441 U.S. at 540.   Summary judgment is therefore appropriate as to these three incidents, and judgment must be entered for Defendants McClave, Brooks, Burkert, Porto, and Hurling.

Turning finally to the excessive force claims against Sheriff's officers Maiorelli and Alonzo, the Court finds that these claims, too, are subject to summary judgment.   A police officer's use of force in an arrest context is controlled by the Fourth Amendment.   *Suarez v. City of Bayonne*, 556 F. App'x 181, 186 (3d Cir. 2014).   The use of force in effectuating a seizure of one's person or an arrest "'contravenes the Fourth Amendment if it is excessive under objective standards of reasonableness.'"   *Id.* (quoting *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002)).

A use of force is reasonable when, under the totality of the circumstances, the actions of the officers are objectively reasonable in light of the facts and circumstances confronting those officers, evaluated from the perspective of a reasonable officer on the scene.   *Lamont v. New Jersey*, 637 F.3d 177 (3d Cir. 2011); *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004); *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004).   In determining the objective reasonableness of the force used, the courts look to a number of factors including:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, . . . whether he is actively resisting arrest or attempting to evade arrest by flight[,] . . . the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Suarez*, 556 F. App'x at 186; *Couden v. Duffy*, 446 F.3 483, 496-97 (3d Cir. 2006).

The use of force by the Sheriff's officers in this instance was entirely justified.   The reports of the officers, as well as the investigatory report of the Sheriff's Office's internal affairs department, as well as the video evidence all clearly indicate that Officer Maiorelli was sent to retrieve Plaintiff by a Superior Court judge, that Plaintiff, after retrieving his belongings, fled from the officer, and that the officers gave chase.   The evidence in the record likewise clearly indicates that the sheriff's officers chased Plaintiff as he attempted to flee seizure and return to the courthouse for his bail hearing.   At the time he was restrained by the officers, Plaintiff was clearly both resisting their attempts to lawfully seize him and had been actively attempting to flee from the court.   As the evidence (including a video recording of his flight and resisting arrest) clearly indicates that the officers then used only so much force as was necessary to restrain and search Plaintiff following his flight, a reasonable factfinder would be compelled to conclude that the objective circumstances, viewed by the officers at the time of Plaintiff's arrest in front of the

courthouse, indicate that the force used was not excessive. The evidence in the record is insufficient to permit a reasonable fact finder to find in Plaintiff's favor, thus Sheriff's Officers Alonzo and Maiorelli are entitled to summary judgment as a matter of law as to Plaintiff's excessive force claim.[6]

**2. Qualified Immunity**

This Court further holds that each of the excessive force Defendants are entitled to qualified immunity. Qualified immunity shields officers performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). In determining whether qualified immunity is appropriate, a court must determine whether the plaintiff has shown that the defendant violated a constitutional right, and that the right in question was clearly established at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearlson v. Callahan*, 555 U.S. 223, 238-40 (2009) (holding that in certain circumstances the Court need only determine whether the right was clearly established as a determination of whether a violation occurred may be highly fact sensitive).

A grant of qualified immunity is appropriate at summary judgment where no reasonable factfinder could conclude that the defendants violated a plaintiff's clearly established rights. *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000). In determining whether an officer's conduct violated such a right, the Court must evaluate "whether it would be clear to a reasonable officer

---

[6] Plaintiff, in his amended complaint, also makes claims against five "John Doe" sheriff's officers. As these John Doe Defendants in Plaintiff's amended complaint are the other sheriff's officers (such as Officer Hidalgo) who were involved in this incident, they, too, are entitled to summary judgment on these claims for the same reasons.

that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201.   Where the facts, viewed in the light most favorable to the plaintiff, do not show that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation, a grant of qualified immunity is appropriate at summary judgment.   *Wilson*, 212 F.3d at 786.

As previously discussed at length, the record, even when viewed in the light most favorable to plaintiff, does not establish that either prison or sheriff's officers engaged in excessive force in securing or arresting Plaintiff.   The officers in this case responded to situations created by Plaintiff's own actions including, resisting and fleeing arrest, creating disturbances, refusal to turn over items to corrections officers, and struggling against officers while in transit.   The officers responded by restraining Plaintiff in a reasonable fashion.   Because the record is such that a reasonable factfinder could not find excessive force, it necessarily follows that the same factfinder could not find on this record that it would have been reasonably clear to the officers that they engaged in illegal conduct at the time they restrained plaintiffs.   *Saucier*, 533 U.S. at 201.   As outlined in detail above, Plaintiff has not shown a violation of his constitutional rights, nor that it would have been reasonably clear that the officers were engaging in unlawful conduct when they restrained Plaintiff, the Court finds that the corrections and sheriff's officers are entitled to qualified immunity regarding Plaintiff's excessive force claims.   *Id.*

### 3.   Failure to Protect

Plaintiff also claims that Sergeants Ospina and Atile failed to protect him from the actions of the officers during the August 3, 2010, incident.   To establish a claim for failure to protect

under § 1983, a prisoner, whether pre-trial or post-conviction,[7] must show that he was incarcerated under conditions posing a substantial risk of serious harm and that the defendant acted with deliberate indifference to the prisoner's health and safety.  *Burton v. Kindle*, 401 F. App'x 635, 637-38 (3d Cir. 2010).   The deliberate indifference standard applies even in those situations where a prisoner attacks the episodic acts or omissions of prison officials rather than the general conditions, practices, rules, or restrictions of confinement.  *Id.* at 638.

Plaintiff claims that two of the corrections officers, Sergeants Ospina and Atile, failed to protect him in relation to the August 3, 2010, incident.  Plaintiff contends that the dangerous conditions to which Defendants were deliberately indifferent was the use of force on Plaintiff by officers Brooks and McClave when they retrieved from him the urinal and cup.  As an initial point, as Plaintiff's claim relies on his allegations of excessive force as the source of the danger to which the two sergeants were allegedly indifferent, his claim must fail in so much as this Court has found summary judgment for Defendants appropriate on the excessive force claims.

Notwithstanding the excessive force analysis, the record clearly indicates that the sergeants were not deliberately indifferent to Plaintiff's health and safety.   The evidence shows that Sergeant Ospina acted reasonably in response to Plaintiff's refusal to turn over the prison cup and threat to throw the urinal at officer McClave, and that he personally oversaw the removal of the items from Plaintiff by the two officers.   As, by Plaintiff's own admission at his deposition, the Sergeant thereafter went to talk to the nurse regarding the incident, and Plaintiff received medical treatment that same day, one cannot say that the Sergeant acted with deliberate indifference.

---

[7] While the evaluation of such a claim, as with excessive force, is under the Due Process clause of the Fourteenth Amendment for pre-trial detainees, and under the Eighth Amendment for post-conviction prisoners, the Third Circuit has held that the same standard, deliberate indifference, applies in both situations.  *See Burton*, 401 F. App'x at 637-38.

*Burton*, 401 F. App'x at 637-38; (*See* Exhibit C to ECF No. 117, Dep. at 21-22).   Likewise,

Plaintiff admitted during his deposition that, after Plaintiff claimed he had been attacked to

Sergeant Atile, Atile retrieved the nurse and brought her to see Plaintiff.   (*See* Exhibit C to ECF

No. 117, Dep. at 48).   Plaintiff's claims that the two officers failed to protect him following, or

during, the August 3 incident are clearly belied by Plaintiff's own testimony which clearly

establishes that the sergeants were not deliberately indifferent to his health and safety.   As such,

Plaintiff's failure to protect claims against the sergeants must fail as a matter of law.   *Burton*, 401

F. App'x at 637-38.


**4.   Deliberate Indifference to Medical Needs**

The final type of claim Plaintiff raises is a claim that the medical Defendants violated his

rights by being deliberately indifferent to his medical needs.   Plaintiff brings such a claim against

the medical Defendants (Romero, Schwartz, Regan, and Prisoner Health Services) and Sergeant

Houston.   A pre-trial detainee has due process rights to medical care which are "at least as great

as the Eighth Amendment protections available to a convicted prisoner."   *City of Revere v. Mass.

Gen. Hosp.*, 463 U.S. 239, 244-45 (1983).   A prison official violates a convicted prisoner's Eighth

Amendment rights where the official is deliberately indifferent to a prisoner's serious medical

needs.   *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).   Deliberate indifference, in this context,

amounts to a reckless disregard of a substantial risk of serious harm.   *See Farmer v. Brennan*, 511

U.S. 825, 837-38 (1994); *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013).   A medical need

is "serious" under the *Estelle* test if it is one which "has been diagnosed by a physician as requiring

treatment or one that is so obvious that a lay person would easily recognize the necessity of a

doctor's attention."   *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.3d 326, 347 (3d Cir.

1987), *cert denied*, 486 U.S. 1006 (1988).   "'Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Everett*, 547 F. App'x at 121 (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n. 2 (3d Cir. 1979)).   Neither a prisoner's subjective dissatisfaction with the care provided nor his disagreement with medical staff's professional judgment is therefore sufficient to establish deliberate indifference.  *See Hairston v. Director Bureau of Prisons*, 563 F. App'x 893, 895 (3d Cir. 2014); *White v. Napolean*, 897 F.2d 103, 110 (3d Cir. 1990); *Andrews v. Camden Cnty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).

Because the Third Circuit has yet to decide on the appropriate standard regarding the evaluation of a pre-trial detainee's due process rights to medical care, *see, e.g., Batts v. Giorla*, 550 F. App'x 110, 113 n. 2 (2013), courts have suggested that such claims may also be evaluated under the *Bell* standard. *Carson v. Mulvihill*, 488 F. App'x 554, 560 (3d Cir. 2012).   As previously discussed, the *Bell* inquiry consists of two prongs: whether the restrictions and practices challenged are rationally related to a legitimate nonpunitive government purpose, and whether they are excessive in relation to that purpose.  *Id.*

Regardless of which test is applied, Plaintiff's extensive medical records clearly refute his claim that the jail staff were deliberately indifferent to his medical needs.   Records indicate that, following his fall on August 2, 2010, the officer who witnessed the fall immediately called for medical help, that nurse Mackie then came to the scene, Plaintiff was lifted into a wheelchair and then transported to medical.   The records also indicate that Plaintiff was seen and evaluated throughout that evening by nurse practitioner Romero and the nursing staff of the medical ward, who checked on him hourly and observed Plaintiff's ability to move his legs, sit up, and shift

position without any apparent difficulty.   The record further indicates that he was thereafter seen by medical staff following the August 3 incident.   Plaintiff was likewise seen by a doctor on August 3, and even taken to the hospital for X-rays.

This brief summary of the events on August 2 and 3 reflect the considerable treatment Plaintiff received for his back problems throughout his time at the jail.   The record clearly shows that Plaintiff was seen by numerous nurses, a nurse practitioner, the jail's doctor, an orthopedist, and ER doctors on multiple occasions.   In the medical opinion of these doctors, Plaintiff's injuries were significantly less serious than he claimed, were the subject of symptom magnification by Plaintiff, and in any event did not warrant Plaintiff receiving an MRI.   Plaintiff's disagreement with their diagnoses and insistence that an MRI was needed is insufficient to show deliberate indifference on the part of medical staff, who appear to have been diligent in overseeing Plaintiff's care, even in the face of his obstinacy and belligerence.   *See Andrews*, 95 F. Supp. 2d at 228; *White*, 897 F.2d at 110.   Even if one applies the *Bell* standard here, there is nothing to indicate that the medical Defendants placed unreasonable restrictions on Plaintiff's care, or that their diagnoses and refusal to provide an MRI amount to deliberate indifference compared to the Defendants' interest in providing Plaintiff effective treatment without unnecessary expense.   *See Carson*, 488 F. App'x at 560.

As to Plaintiff's claims against Sergeant Houston for housing Plaintiff on the second floor prior to his fall, Plaintiff's claim is similarly refuted by the record.   Plaintiff's records indicate that, after he made the jail aware of his need for a lower tier and bunk, staff took note of those issues.   (*See* Exhibit A to ECF No. 118 at 17-21).   During the period prior to the August 2, 2010, fall, Plaintiff was transferred to various jail units, including medical and detention, on multiple occasions due to his behavioral problems, gang affiliation, medical and psychological issues,

personal problems with cellmates, and disciplinary sanctions. (Id.). These records also show that the jail attempted, when possible, to accommodate Plaintiff's needs for a lower tier and bunk. Plaintiff has provided no evidence that the Sergeant acted with reckless disregard of Plaintiff's alleged back condition, nor his alleged inability to safely traverse stairs. Plaintiff has at most pled that the Sergeant was negligent in placing him in a cell requiring stairs, which is insufficient as a matter of law to support Plaintiff's § 1983 claims. *See Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986); *Wright v. Warden, Forest SCI*, 582 F. App'x 136, 138 (3d Cir. 2014) (negligence not actionable under § 1983); *Pierce v. Pitkins*, 520 F. App'x 64, 66 (3d Cir. 2013) (claims of negligence insufficient to show deliberate indifference). Plaintiff's claim against the Sergeant must therefore fail. Sergeant Houston is thus entitled to summary judgment.

Plaintiff's claims against Prisoner Health Services, Patricia West, and Brian Riordan suffer from a further fatal flaw. As with Riordan and Prisoner Health Services, Defendant West does not provide medical care to inmates at the jail. (Exhibit B to ECF No. 118 at ¶ 1-2). It appears that Plaintiff seeks redress from these individuals not for their actions or omissions, but rather for the actions or omissions of their subordinates. Such a theory of respondeat superior liability is not available in a § 1983 claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978) (rejecting vicarious liability under 42 U.S.C. § 1983). Plaintiff's claims against Riordan and Prisoner Health Services appear to be based entirely on such a theory, as Plaintiff has provided no evidence of any direct actions or omissions on their part sufficient to establish a claim under § 1983. Given that West does not treat prisoners but only refers them for treatment, Plaintiff's claims against her are either belied by his extensive record of treatment (in so much as Plaintiff claims she should have ordered more treatment than he received), or would arise similarly out of the supposition that she has supervisory

authority the medical staff who treated Plaintiff.   As such, the claims Plaintiff raises against West

(in so much as they are vicarious), Riordan, and Prison Health Services are barred under §1983,

and these defendants are entitled to summary judgment.   *Iqbal*, 556 U.S. at 676; *Monell*, 436 U.S.

at 691; *see also Taylor v. Plousis*, 101 F. Supp. 2d 255, 263-65, 263 n. 4 (D.N.J. 2000) (holding

that a corporation performing a municipal function, such as a medical corporation providing

healthcare to inmates on behalf of the jail, cannot be sued under § 1983 under a theory of vicarious

liability).   Defendants are therefore entitled to summary judgment on these and all of Plaintiff's

federal claims.[8]

## III. CONCLUSION

For the reasons stated above, Defendants motions for summary judgment are GRANTED,

and judgment is entered in favor of all Defendants on Plaintiff's claims.   An appropriate order

follows.


s/Susan D. Wigenton, U.S.D.J.


Orig:   Clerk
Cc:     Parties

---

[8] In his summary judgment briefs, Plaintiff belatedly asserts for the first time that a state law
claim for intentional infliction of emotional distress would also lay against Defendants.   (ECF
No. 121).   This claim was not pled in Plaintiff's amended complaint.   (ECF No. 14).
However, to the extent that it is before this Court, it is a state law tort claim, *see Kounelis v.
Sherrer*, 529 F. Supp. 2d 503, 532 (D.N.J. 2008), and as this Court grants Defendants' summary
judgment motions on all of Plaintiff's federal claims, this Court declines to extend supplemental
jurisdiction over this claim.   28 U.S.C. § 1367(c)(3).